W. SHARP, Judge,
dissenting.
I respectfully disagree with the majority per curiam affirmance, without opinion. This was a very close case, hinging on the credibility of witnesses. The prosecutor’s closing argument in which he bolstered the state’s two witnesses’ credibility and vouched for their veracity, was manifestly improper. I cannot agree that the state demonstrated beyond a reasonable doubt that the cumula *569 tive effect of these errors did not contribute to the guilty verdict. See Willis v. State, 669 So.2d 1090 (Fla. 3d DCA 1996). Thus, I would reverse this ease for a new trial, although I agree, that had no such error occurred, this case should be affirmed.
Sehlotterlein was convicted of shooting into an occupied vehicle[1] and discharging a firearm in public,[2] a lesser included offense of aggravated assault with a deadly weapon. The charges arose out of a senseless confrontation, west-bound on U.S. Highway 50, where it narrows from four to two lanes after the 1-75 interchange, heading towards Brooksville, Florida. Unfortunately rude and aggressive behavior on our roadways is not uncommon, but rarely does it end in the discharge of a firearm.
Sehlotterlein admitted he shot at a white van driven by Frey, in which Smith and Taylor were passengers. Schlotterlein’s defense was self-defense: he had reason to think the van was going to hit him and push his car off the road, he was frightened for his safety, and he reasonably thought he had to take drastic steps to prevent harm to himself.[3] His version of what occurred was corroborated by a disinterested witness, Kathy Rice, who had been driving behind the van during the series of events.
Smith and Taylor testified Frey had been driving the van too fast and should have backed off, but they disputed Schlotterlein’s testimony that the van had put his vehicle in a position of peril, which required use of deadly force on his part. Smith testified that he was a passenger occupying the front seat of the van, at the time of the incident. Frey became upset when a little red car cut in •front of the van, as they were on their way to work early in the morning. It required Frey to slam on the brakes. Thereafter, Frey repeatedly tried to speed up and pass the red car, but it also accelerated and pulled to the left, making passing impossible. Smith conceded that they had been trying to pass in a no passing zone. A few days after this incident, he quit his job because he did not like the way Frey drove. He said it wasn’t worth risking his life to drive with Frey. “If I’m going to go to work, I want to get there in one piece.”
Taylor had been sleeping in the back seat ' of the van. He woke up moments before the shooting took place, when the van stopped abruptly and threw him off the seat. They had come to a red light, and stopped behind the red car and other traffic. He saw Sehlot-terlein opening up the glove compartment and he warned Frey he thought the driver was getting out a gun. He urged Frey to back off and let the red car go. Frey was agitated, cursing and shooting birds. After the light turned green, the van pursued the red car, again trying to pass it. They dropped back, and that was when the driver of the red ear reached with his right hand out of the window and fired two or three shots at the grill of the van, disabling it.
Sehlotterlein testified to quite a different scenario. He was going to work, driving west on Highway 50. He saw cars coming off 1-75, including the van. The van was in the right lane, and he was in the left. He passed a car in front of him, passed the van, and ended up in the right lane, which had the right-of-way where the two lanes merged to one. He saw the van charging up in the left lane, although at that point it should have been yielding the right-of-way. To avoid the van, he accelerated and the van swung in behind him only three feet off his bumper.
In order to warn the van not to tail gate, he tapped his brakes. The van began swerving to the right and to the left. It would charge up so close to him he could only see the grill, drop back, and charge up again. He had nowhere to go. At that point, Highway 50 is only two lanes. There was oncoming traffic, traffic in front of him, and a six-inch drop off on the shoulder. He was *570 afraid the van was going to hit him, and he knew his small subcompact ear would afford little protection.
They came to a traffic light. The cars ahead stopped and the van stopped behind him. He could see the driver gesturing, shooting “birds,” and yelling and acting like he was nuts. While the car was stopped, he' unlocked and opened his glove box, pulled out his revolver, loaded it, and put it on the seat. Schlotterlein is a marksman and the gun had been in the car since he had returned from a trip to the firing range.
The driver started to get out of the van, yelling obscenities. Just at that moment, the light changed and Schlotterlein followed the traffic through the intersection, hoping to escape from the van. Beyond the traffic light, the road curves.
But, again the van charged up behind Schlotterlein’s ear. It drove up the center line immediately to Schlotterlein’s left. Again he had nowhere to go to escape from the van. There was traffic ahead of him, oncoming east bound traffic in the other lane, and a drop off on the shoulder to the right.
At that point, Schlotterlein testified he feared that the van was going to hit him and knock his car off the road. The van pulled up along side his car, and was only a few feet away. It was then Schlotterlein pulled the revolver up and with his left hand (he is left-handed) he shot directly at the van’s grill. He testified he only intended to disable the van so he could escape harm to himself.
During this whole encounter, Rice had been following the van, on her way to work. Rice also testified that the red car had not cut off the van. She noticed the van driving in an erratic manner, speeding up and slowing down, jumping and swerving right behind the red car. The van would go out around the car but would not pass and then come back in. “And, that was strange because there’s nowhere to pass in that area.”
Rice said she backed off and left more space than usual between her ear and the van because she thought there was something “wrong” with the driver of the van. She stopped behind the van at the red light. When the red car went through the green light, the she saw the van again pursue it, driving in an erratic way. She said she would have been afraid if she had been in the red car.
The testimony of Rice and Schlotterlein, corroborated to some degree by Taylor and Smith, established at least a •prima facie case of self-defense. Whether Schlotterlein could have safely retreated rather than using deadly force to defend himself was a jury issue. Its resolution depended on whose version of the facts the jury chose to believe.
In a criminal trial, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense. Brown v. State, 454 So.2d 596 (Fla. 5th DCA), rev. denied, 461 So.2d 116 (Fla.1984). That is why the prosecutor’s remarks in closing argument, which improperly bolstered the credibility of the state’s witnesses, were so potentially harmful. The prosecutor said:
William Frey is not here. Please don’t hold it against him ... [or] the state of Florida.
[Appellant] comes in here, ladies and gentlemen, and has admitted to the whole thing. He’s just saying that our law doesn’t matter, that there are circumstances that you could find him not guilty because our law is not important.
[Defense Counsel]: Objection Your Honor. That is not a fair comment on the testimony nor the law.
The Court: I’ll sustain the objection. [Prosecutor]: Who did we bring in as witnesses? We brought in two victims. We had to. They had to be scared. They were scared. Their credibility. One came from Charlotte, North Carolina, took off a day, two days from work, came here to testify because he was seared. He told you he was. Another man took a day off work. They could have forgotten it. They could have gone away. They could have not shown up. One of them didn’t show up.
[Defense Counsel]: Objection Your Honor. This line of argument has nothing to do with the facts and circumstances of the trial. Just because the State bought him a ticket and sent it to him and said “come on *571 down here, you’re under subpoena,” doesn’t mean that they just had to come down here.
[Prosecutor]: Your Honor, it goes to credibility of the witness and what they have to gain.
[The Court]: I’ll overrule the objection, please continue.
[Prosecutor]: We didn’t produce William Frey, and I know that. If that bothers you, write to Sheriff Mylander, tell him, You should have got Steve Klapka out there to try to find him.’ We tried to find him. We did. Because we failed to find one witness don’t let a guilty man walk. Don’t let him not be found guilty of what he did.
Rule 4-3.4(e) of the rules regulating the Florida Bar governing professional conduct provides:
A lawyer shall not:
[[Image here]]
(e) [I]n trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused, (emphasis supplied).
The quoted remarks appear to violate this rule in multiple regards. The prosecutor bolstered the credibility of his witnesses simply because they appeared at trial. He also expressed his opinion that the defendant was guilty.
Many appellate cases are reversed and remanded for a new trial due to improper comments by counsel, expressing personal opinions as to credibility of a witness. See Davies v. Owens-Illinois, Inc., 632 So.2d 1065 (Fla. 3d DCA), rev. denied, 641 So.2d 1346 (Fla.1994); Clark v. State, 632 So.2d 88 (Fla. 4th DCA 1994) (prosecutor may not argue that police officer’s testimony should be believed simply because he or she is a police officer or that police officers would not testify falsely because they have too much at stake and would not risk their jobs); Silva v. Nightingale, 619 So.2d 4 (Fla. 5th DCA 1993); S.H. Investment & Development Corp. v. Kincaid, 495 So.2d 768 (Fla. 5th DCA), rev. denied, 504 So.2d 767 (Fla.1987); Seguin v. Hauser Motor Co., 350 So.2d 1089 (Fla. 4th DCA 1977).
Where the case is “close,” because the evidence to convict is not overwhelming, and the case turns on conflicting testimony, reversal is the only way to ensure the defendant of a fair trial.[4] In this case, the reasonableness of Schlotterlein’s self-defense actions depended on which version of the incident the jury believed: his, or the two state witnesses, whose testimony was improperly bolstered. Theirs was disputed by Sehlotterlein’s testimony as well as Rice’s. Under these circumstances, I have to conclude the error was not harmless. I would reverse the convictions and remand for a new trial.

. § 790.19, Fla.Stat. (1993).

. § 790.15, Fla.Stat. (1993).

. Section 776.012, Florida Statutes (1993), provides:
776.012 Use of force in defense of person. — A person ... is justified in the use of deadly force only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or to prevent the imminent commission of a forcible felony.

. Shorter v. State, 532 So.2d 1110, 1111 (Fla. 3d DCA 1988).